UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

OPERATING SYSTEMS SOLUTIONS,
LLC,
Plaintiff,

v.                                                       Case No. 8:11-cv-1754-T-30TGW

APPLE INC.,
Defendant.
_____/

SPECIAL MASTER'S REPORT AND RECOMMENDATIONS
REGARDING CLAIM CONSTRUCTION

     1.     The Court appointed the undersigned by a reference order dated January 7, 2013, to make recommendations regarding resolution of patent claim construction (Markman) issues.

     2.     The patent involved in this case (Kang U.S. Reissue Patent Re40,092) involves methods for quickly booting a computer system by using a saved boot configuration information (hereafter "BCI") from an earlier normal boot operation. The patent contains 62 claims, most of which are at issue in this case. The parties are in disagreement on the meaning of many of the terms of the contested claims. They have briefed their positions and provided the Court with evidence in the form of published documents and expert testimony to assist in the claim interpretation process.

     3.     During the course of my work, the parties' experts kindly answered several technical questions which I posed to them in writing regarding the patent in suit. On March 21 I held a full-day hearing at the courthouse in Tampa on the various claim-construction questions in the case. A draft version of this report was provided to the parties on April 3, with instructions to inform me of anything contained in it that the parties agreed was incorrect. Two such items were brought to my attention, and corrections have been made.

Legal Standards

4.    The coverage of a United State patent is determined by the patent's claims, which appear at the end of the patent. Each claim stands alone for adjudication, see 35 U.S.C. § 282(a). However, many patents, as here, use a given word or phrase in more than one claim. In such circumstances it is the normal rule that the words should be interpreted the same way for each occurrence. See, e.g., *Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1371 (Fed. Cir. 2003) ("If a claim term appears in more than one claim it should be construed the same in each.")

5.    The overall purpose of claim construction is to simplify the tasks of the ultimate trier of fact by addressing technical terminology that may appear in a claim and substituting wording that may be more readily understandable to the trier. See *Multiform Desiccants, Inc. v. Medzam, Ltd.,* 133 F.3d 1473, 1477 (Fed. Cir. 1998) (claims are construed as an aid to the decision-maker, by restating the claims in non-technical terms); *Abbott Labs. v. Sandoz, Inc.,* 544 F.3d 1341, 1360 (Fed. Cir. 2008) ("Claim construction" is for the purpose of explaining and defining terms in the claims, and usually requires use of words other than the words that are being defined.)

6.    The Supreme Court in *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996), affirmed that the construction of patent claims is a matter of law exclusively for the Court. The central remaining question was how courts should go about carrying out that function.

7.    For patent claim construction guidance, two leading Federal Circuit cases, upon which many others are based, are *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996), and *Phillips v. AWH Corp*., 415 F.3d 1303 (Fed. Cir. 2005) (en banc). I have tried to apply all aspects of these cases, and any others brought to my attention, throughout my assignment in this case. The rules of law are essentially the following:

(a) There are two general types of sources for claim construction, intrinsic evidence, which is publicly available in connection with the patent (e.g., claim language, patent specification, and prosecution history), and extrinsic evidence (e.g., dictionaries, treatises, and expert and inventor testimony), which might not be readily publicly available but still can be helpful. *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576,

2

1582 (Fed. Cir. 1996). Due to its ready availability to the interested public, intrinsic evidence is the "most significant source of the legally operative meaning of disputed claim language." *Vitronics Corp.*, 90 F.3d at 1582, but extrinsic evidence can be considered as well, provided it does not contradict the intrinsic record. *Phillips,* 415 F.3d at 1317.

(b) Most patent claims are generic, meaning that a given claim commonly covers many different configurations of products. The written description of a patent, as distinguished from the claims, often describes only one or two preferred embodiments of the claimed invention. Although the written description is the primary basis for construing a disputed claim term, s*ee Phillips*, 415 F.3d at 1315, the embodiments there described are exemplary only, and it is normally improper to restrict the scope of a claim by interpreting it in a manner that imports into it a feature shown in the preferred embodiments. See, e.g., *CollegeNet, Inc. v. ApplyYourself, Inc.,* 418 F.3d 1225, 1231 (Fed. Cir. 2005) ([i]n examining the specification for proper context it is improper to import limitations from the specification into the claims); *Playtex Prods., Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 906 (Fed. Cir. 2005) ("The court must take care in its analysis, when locating in the written description the context for a disputed term, not to import a limitation from that written description.  It must use the written description for enlightenment and not to read a limitation from the specification").

(c) The particular order in which the court considers evidence is not critical; it is the weight attached to particular evidentiary sources that matters. *Phillips,* 415 F.3d at 1324.

(d) The words used in the patent claims are generally given their ordinary and customary meanings as understood by one of ordinary skill in the relevant art at the time of the invention (i.e., the effective filing date of the patent application) and in the context of the entire patent. *Phillips,* 415 F.3d at 1312-13, 1314-15. The parties appear to be in agreement about the background of a person of ordinary skill in this art:  The person would have a bachelor's degree and three or more years of experience in the field of systems software, or a master's degree and somewhat less experience. Apple Br. 6. ; OSS Resp. Br. 3.

(e) The "ordinary and customary" meaning of a term may be overridden in claim interpretation where the inventor has elected to provide her own meaning for a term in a patent, a process known as being her own lexicographer, provided she is clear in doing

so. See, e.g., *Vitronics Corp.,* 90 F.3d at 1582 ("[W]ords in a claim are generally given their ordinary and customary meaning, [but] a patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history.")

(f) The proper interpretation may be readily apparent to a layperson, in which case the court should simply apply the widely accepted meanings of common words. *Phillips,* 415 F.3d at 1314.

With these principles in mind, we now address the claim construction questions in this case.

Technology Involved

8.     The Kang Re40092 patent in suit is entitled "Method for Quickly Booting A Computer System." The patent's abstract tells us that the method involves saving on a hard disk specific information from a prior boot process, and later using that information to boot the system more quickly than would otherwise be the case. The abstract lays out three steps for such utilization: (i) performing a power-on self test (POST) of the system's components; (ii) performing a normal boot process; (iii) saving to a hard disk the then-existing contents of memory and the status of devices (collectively called the boot configuration information, or "BCI"); (iv) if and when a reboot is requested, checking whether certain system parameters have changed; and (v) if changes are noted, storing a new version of the BCI for later use, but if no changes were noted, completing the reboot quickly by eliminating the need for execution of certain files that would otherwise have to be executed and would delay the rebooting process.

9.     In the written description portion of the patent, in the Background of the Invention section, the patentee candidly concedes that quick reboot methods involving saved information were known before, in what he refers to as "the conventional art." Col. 2, lines 24-62; see also Fig. 2 of the drawings.  This conventional approach involved, as does the patent in suit, saving certain boot information to a disk for later quick-boot use. Col. 2, lines 38-46. Two different conventional quick-boot methods are briefly described in the patent. One is merely saving the results of the power-on-self-test (POST) of attached devices, initializing them and determining their status. Col. 2, lines 24-30. This information is then saved to disk storage so that some or all of the power-on-self-test can

4

be skipped in a later boot. It can be referred to as "quick POST." The second conventional way to quicken the boot process is described as involving the saving of the working environment, or all information stored in memory, to be brought back into memory in a subsequent boot process, hopefully to save time but subject to certain perils if memory is too large. Col. 2, lines 55-62.

10.     In the section of the patent labeled Summary Of The Invention, the patentee states the method of the invention, in much the same terms as in the abstract. We shall address this Summary in much more detail later herein.

Description of the Preferred Embodiment

11.     We come now to the section of the patent headed "Detailed Description of the Preferred Embodiment." We must bear in mind that the details of the preferred embodiment usually do not limit any of the claims. However, the preferred embodiment is often helpful in providing some clues as to the proper scope of a claim, because the claim usually must cover, as a minimum, at least one described embodiment.

12.     The preferred embodiment is described from column 3, line 65, through column 6, line 24 of the written description. These passages make reference to Figures 4-7 of the drawings. Although stated as a single embodiment, I find actually two largely distinct embodiments: the one shown in Figs. 3 and 5; and the other shown in Fig. 4. The main difference is that in Fig. 4 a "new boot configuration information" is saved at step 39 only if there was no older one already on the disk as seen in step 38. In Figs. 3 and 5, the BCI is saved whenever, after some checking, it is determined that changes to the system have been made, such that any former BCI is no longer up-to-date for use in a reboot.

13.     Following a normal boot operation and the saving of a BCI as described in the patent in suit, the next time the system is booted up the user may find it takes less time. The Kang patent teaches that during that subsequent booting, a check must be made to determine that (a) there is in fact a BCI saved to disk storage from before; and (b) the system has not been changed in the interim, for example, by addition of new peripheral devices or addition of more programs that will be started automatically during subsequent boots. If these conditions are met, the patent says the boot operation can skip the

5

execution of the files designated CONFIG.SYS and AUTORXEC.BAT, thereby shortening the time needed for booting.

14.    For the particular embodiment of Fig. 5, the detail of what aspects of memory content are to be saved, and under what conditions, are indicated to be a 64 KB segment of memory that is examined to see if it contains all zeroes. If it does not, the content of that segment, and its address, are saved to the disk as part of the BCI. Col. 5, lines 7-16.

15.    When we reach the claims we find varying definitions of what is saved in the BCI, how it is done, and how it is later utilized in to speed up a later booting process. Varying definitions are the reason claim drafters include more than one claim in a patent application. For example, here claim 1 recites that the BCI "comprises selected portions of main memory contents" as well as other things. and claim 8 mentions the step of "resuming the contents of memory blocks, addresses of which have been stored." These claim recitations suggest that some, but not all, portions of the memory content went into the BCI. The parties apparently agree with this interpretation. Only some of the main memory content is selectively saved. See Apple Br. 11; OSS Br. 7-8. Whether the selection is based on having looked at all portions of main memory is perhaps not agreed. This will be discussed in more detail later herein. Other claims recite somewhat different definitions of the method. We need to consider those claims that are asserted by OSS to be infringed by Apple. I am not privy to any of the infringement contentions of either side, but I have been provided a list of asserted claims of the patent.

16.    We now proceed to consider the various words and phrases appearing in the claims asserted by OSS as being infringed by Apple, and for which the parties say are in need of interpretation. This analysis will proceed in two parts, the first looking at terms appearing in what we might call the originally asserted claims, i.e., claims 1, 6, 19, 28, and 57, and the second looking at additional claims identified in the Court's order of December 19, 2012 (DI 86), namely, claims 2-4, 7-9, 13-18, 29, 31-56, and 58.


First set of claims


A. BIOS functions

17.    The parties are in agreement that the term "Basic input output system (BIOS) functions," appearing in claims 19 and 28 should be interpreted as:

Functions performed by a BIOS

Since the parties are in agreement, this is my recommendation for this phrase. However, this agreement does not presuppose that the parties concur on the limits of "BIOS" itself. That topic is quite controversial and will be taken up separately later herein.

## B. Boot[ing] process

18.    The next phrase needing interpretation is variously expressed in claims 1, 6, 19, 28, and 57 as "boot process," or "booting process."

19.    The parties are in approximate agreement about when such a process begins, but they are in disagreement on whether it has a fixed end point. OSS contends the phrase means "an initial set of operations that a digital electronic device performs when electrical power is switched on or a reset button is pressed." According to this view, the phrase is open-ended, or generic, in that it does not specify when the booting process is concluded.

20.    Apple's definition is closed-ended: "The process beginning when a computer system is powered on or a reset button is pressed and terminating when the system is brought into a known useful state in which application programs can be executed." By Apple's definition, booting is over when application programs can be executed. Apple contends this is proper, since the definition "is taken directly from the specification" of the Kang patent in suit. Br. 6.

21.    This is the first of many instances in this case where we shall have to decide whether usage of wording in the written description portion of the patent is definitional, thereby constraining the scope of claim words, or merely illustrative of one, or some, ways of accomplishing something. Many patents are written without providing definitions of terms appearing in their claims. When the patent does not provide an explicit definition, we look to the sources indicated in the case law cited earlier herein, to determine the scope a person skilled in the art would have given to that term at the time of the filing date of the application that led to the patent. In this case the actual United

States filing date was May 11, 1999, but the parties have agreed that the earlier Korean filing date, May 11, 1998, should apply, and I will adopt that date. The parties appear to agree that a person of ordinary skill in this field at that time would have had a bachelor's degree and three or more years of experience in the field, or a master's degree and somewhat less experience. Apple Br. 6; OSS responsive Br. 3.

22.    Agreement upon the credentials of this hypothetical person skilled in the art unfortunately does not resolve the question. OSS contends that the phrase has no fixed end point, and that Apple's attempt to read one into the phrase is an "arbitrary and ambiguous" reading. OSS responsive Br. 3.

23.    In the context of the patent in suit, I do not believe Apple's proposal is either arbitrary or ambiguous. In the patent's section entitled Background of the Invention, we find this passage:

> "When power is applied to the computer system, the computer system starts to be booted to load an operating system (OS) and thus is brought into a known useful state in which application programs can be executed. *This procedure is generally called 'booting'*." (Col.1, lines 30 to 35, emphasis added.)

OSS has argued at the hearing that the patent's wording here is not complete – it does not say that this is all there is to booting; there could be more. I do not accept that argument. If the applicant had wanted to tell us more about booting, he could readily have done so, but chose to end his sentence there. The only fair conclusion is that booting likewise ends there. This is an instance of the patentee's being his own lexicographer. He is providing not an example, but the meaning of a phrase. It is given not in connection with any particular example of the invention, but in the Background of the Invention section of the patent.

24.    Moreover, the extrinsic evidence supports the view that booting is over when the computer's user can get to work. Apple's expert, Dr. Ligler, has testified (Depo. 154):

> For initiating user operation, normal user operations, I would maintain and have maintained that the user filling his or her password and user IDs into the dialogue box is a normal user operation, so initiating normal user operations, with emphasis on initiating . . . would be done by putting up the password dialogue box.

25.    I therefore concur essentially with Apple's reading of the phrase. "Boot[ing] process" for purposes of this patent means

> The process beginning when a computer system is powered on or a reset button is pressed, and terminating when the system is brought into a known useful state in which application programs can be executed. This state is indicated by the loading and presentation to the user of the graphical user interface, such as a user log-in screen.

## C. Boot configuration information (BCI)

26.    We next move to a phrase which from the parties' briefing appears to have considerable significance in the case. Asserted claims 1, 6, 19, 28, and 57 contain the phrase "boot configuration information," or for short, BCI. This refers to information obtained at during or after a normal booting operation, which is at some time stored in non-volatile (e.g., disk) storage for use in a later boot operation, hopefully to speed up that later operation.

27.    OSS contends the phrase should mean "information relating to a previous or first normal boot process that can be at least partially used in a subsequent boot process or second boot process or OS boot."

28.    Apple contends the phrase should mean "information reflecting, at a point in time during a boot, the contents of main memory and the status of attached devices."

29.    We here encounter another instance of the patentee being his own lexicographer. In the Summary of the Invention section of the patent, at co. 3, lines 23-29, we see this:

> According to the quick booting method of the present invention . . . a boot configuration information that is resident in a memory, i.e., the status of devices and the contents of memory are saved into a disk.

The inventor's use of i.e., *id est,* "that is," has significance here. The inventor is telling us what a BCI, in the sense of this patent, is: the status of devices and the contents of memory.

9

30.     I do not believe there is any dispute about Apple's addition of "attached" before devices (it could hardly mean anything else) or "a point in time." Status of devices, and especially contents of memory, are obviously subject to frequent changes. The phrase here is looking at those parameters at some single point in time, what Apple refers to as a "snapshot," using a baseball game rain-delay analogy. I think there is no dispute that the BCI has to be a snapshot in time, but the question remains whether that snapshot must necessarily be taken during the boot process as Apple contends.   OSS argues: "There's nothing in the patent that requires the BCI to be captured during the boot process." AM Tr. 49. For restoring the BCI, a different limitation, OSS's position might be right; but here we are talking only about the initial capture of the BCI onto a disk.

31.     In the Summary of the Invention section of the patent, we see two statements of interest regarding this question of timing of capturing the BCI:

> It is therefore a primary object of the present invention to provide a method and apparatus that significantly reduces the time required for boot process after a POST operation by using a boot configuration information on memory and the attached devices that were *created and saved in a disk in the preceding boot process*. Col. 2, line 65 – Col. 3, line 3 (emphasis mine).

> To achieve the object, the present invention provides a method for quickly booting a personal computer system, comprising the steps of . . . checking if a boot configuration information that was *created in the preceding boot process* exists in a disk. Col. 3, lines 10-11 (emphasis mine).

32.     I regard these statements in the summary of the invention as lexicographic. The inventor is telling us the time of BCI capture for his invention, not for merely a preferred embodiment of it.

33.     In view of the definition given by the patent applicant in these several passages of the patent, I believe Apple's construction is the proper one:

> information reflecting, at a point in time during a boot, contents of main memory and the status of attached devices.

## D. Selected portions of main memory contents

34.    Claims 1 and 6 of the patent in suit contain the phrase "selected portions of main memory contents." The patent makes clear, and I do not believe the parties have any disagreement, that the selection is for the purpose of storage in a non-volatile medium, e.g., a hard disk. Moreover, the parties have expressly agreed that the phrase here under consideration requires that some, but not all, of the contents of main memory at some point in time are selected for this storage. Where the parties differ is on whether or not the phrase requires that the selection be based on first checking "each portion" of the main memory.

35.    Apple contends the phrase requires each memory portion to be checked, and OSS says it is not required. Apple's proposed interpretation is: "Portions, but not the entirety, of main memory contents selected based upon a check of contents of each portion of main memory." Apple correctly points out that in the reissue prosecution history before the PTO, the applicant's counsel argued to the examiner that the selection had to be made that way. Apple cites two passages from the reissue file history to support its argument. The first was in a response filed August 1, 2005, to a then outstanding office action in which the examiner had rejected certain claims over a prior-art reference patent to Shinjo. The applicant's attorney stated (emphasis Apple's):

> While Shinjo does describe storing of all main memory contents to a backup location (see, e.g., Shinjo, col. 4: lines 9-23), Shinjo does not describe certain aspects of the present claims, such as the selective storing of the contents of main memory, as is required by many of the presently pending claims, such claims [sic] 4, 13-14, 18, 21-29, 33-44, 46-49, and 56-59. [RFH 76.]

Apple's reliance on this passage is misplaced. The attorney's argument did not say that the applicant's claims required a checking of the entire contents of main memory before selecting portions for storage. It merely says the contents are "selectively" stored without stating how the selection is made.

36.    The second file history passage relied upon by Apple is more to the point here. In a response dated February 13, 2006 [RFH 114-128], to another office action, in which some claims were rejected on a prior-art reference patent to Lay. Here Kang's patent attorney argued (again with Apple's emphasis):

11

> [T]he Examiner also stated in the recent Office Action that the Lay reference teaches <u>selective storing</u> of the content of the memory based on the memory contents checking result …. *Applicant submits that the present invention is quite different from the Lay teachings in many respects, such as the selective storing of each portion of memory based upon a check of contents of that portion.*  [RFH 127.]

Here the applicant's attorney was defining "selective storing" (the phrase used in amending the claims that had been rejected based on Lay) as necessarily being based on checking every portion of main memory before making the selection. As the Federal Circuit has stated, "[W]ords in a claim are generally given their ordinary and customary meaning, [but] a patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history." *Vitronics Corp.,* 90 F.3d at 1582. The ordinary meaning of "selective storing of the contents of memory" might not necessarily require that all portions of memory first be checked. But the attorney's argument is clear that such was his intention, and that is what appears in the file history, "each portion" must be the subject of "selective storing." The context of the patent makes clear that the selection is based on whether the portion being examined contains all zeroes. If so, that portion is not stored; otherwise, it is. Nothing to the contrary appears in the patent or the prosecution history. The intrinsic record thus supports Apple's position.

37.    Moreover, the description of one of the preferred embodiments is consistent with Apple's reading. In discussing Fig. 6 of the drawings, the Kang specification states that "the INT 2Fh service routine checks if a memory segment of 64 KB is filled with '0', *while scanning every memory segment* (S72). Col. 5, lines 13-15 (emphasis added). While features of described embodiments are not determinative of claim scope, it is nonetheless usually important to see if the description of those features is consistent with the interpretation ultimately arrived at. Here, the feature is consistent, further supporting Apple's interpretation.

38.    OSS's proposed definition, "A portion, but not the entirety, of RAM that is explicitly selected" injects "explicitly" to modify "selected." I cannot find the word "explicit" or "explicitly" anywhere in the patent, and I see no reason to include it here.

39. I therefore recommend that the Court should adopt as the meaning of "selected portions of main memory contents":

> Portions, but not the entirety, of main memory contents, selected based upon a check of contents of each portion of main memory.

## D(1): <u>Selected areas of computer memory</u>

40. The parties have agreed that this term, found in claim 52, should have the meaning ascribed immediately above, in topic D, except that "portions" should here be changed to "areas." Accordingly, I recommend that the Court adopt as the meaning of "selected areas of computer memory":

> Areas, but not the entirety, of main memory contents, selected based upon a check of contents of each area of main memory

## E. <u>Selectively stored portions of main memory contents</u>

41. Asserted claims 19, 28, and 57 contain a variant of the phrase just discussed. In these claims it is "selectively stored portions of main memory contents." The parties have properly treated the phrases as generally having the same meaning. See Apple Br. 11; OSS Br. 11. I will do so as well.

42. OSS proposes that the storage can be "either temporarily or permanently." For reasons I will elaborate in Topic J below, while the final resting place of the storage must be non-volatile to avoid being lost at power-down, I see no reason to constrain the nature of storage in the first instance. Moreover, although Apple in its briefing argued (Resp. Br. 9) that the storage must be in a non-volatile medium, Apple's proposed construction of this particular phrase imposes no such constraint. It reads as follows:

> Portions, but not the entirety, of main memory contents selected and stored based upon a check of contents of each portion of main memory (*i.e.*, temporary storage random access memory).

Apple at this point in the construction specifies the nature of main memory (a point no longer in dispute), but not of the storage medium. I therefore recommend a construction that omits a constraint on the nature of the storage medium:

> Portions, but not the entirety, of main memory contents, selected and stored based upon a check of contents of each portion of main memory.

### F. Resuming a boot configuration by using the boot configuration information

43.     Asserted claim 6 contains the phrase "resuming a boot configuration by using the boot configuration information." The BCI is defined in the preceding section hereof, and refers to information gathered in an earlier normal boot operation for possible use later in shortening the time needed for a subsequent boot operation. So the present issue centers around "resuming." The phrase is somewhat awkward, in that we usually resume actions or activities rather than resuming things. However, as mentioned before, the task here is to interpret the phrase as it would be read by one skilled in the art.

44.     OSS contends the phrase here under consideration should mean "using boot configuration information from a previous normal boot process in a subsequent boot process." By this reading, "resuming" would mean any using, at any time, of the stored BCI.

45.     Apple contends the phrase should have a more restricted scope, meaning "Using the boot configuration information from a previous boot process, resuming in a subsequent boot process that previous boot process at the point in time represented by the boot configuration information." Apple supports this position with a declaration of its technical expert, Dr. Ligler, who states first of all that a person skilled in the art would understand "restoring" and "resuming" differently.  (Ligler decl., ¶¶ 31-33.) In the Kang reissue patent in suit both terms are used, and the usual presumption is that they have, as Dr. Ligler says, different meanings. See, e.g., *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1119-20 (Fed. Cir. 2004) ("[W]hen an applicant uses different terms in a claim it is permissible to infer that he intended his choice of different terms to reflect a differentiation in the meaning of those terms.") I agree with this view, and OSS apparently agrees as well. (OSS Resp. Br. 11) One must restore, i.e., bring back, the information from the non-volatile storage medium before one can resume using it.

14

46.     However, that still leaves open the question of whether "resuming" should be further defined to require resumption at the same point in time or same point in processing where the BCI was taken in the prior boot. As to this, Dr. Ligler states: "In the context of the '092 patent, such a person would define "resuming" as "continuing execution of a computer system from a particular previous point in time . . ." (Decl. ¶ 30). He also states his familiarity with that usage in the computer software field, and that back into the 1980s "resuming" always had the point-in-time context. (Decl. 31)   OSS has presented no expert evidence to the contrary. I have looked for technical dictionary assistance on this subject, but have not found any in point.

47.     I have some difficulty with Apple's "point in time" language, since the time, strictly speaking, has obviously changed from the time of an earlier boot to the time of a resumed BCI. I have therefore slightly modified Dr. Ligler's language to indicate not literal time as we use the word, but rather "same processing point":

> in a later boot process, using previously stored boot configuration information at the same processing point from which it was previously taken

## G. Restoring boot configuration information

48.     Asserted claims 28 and 57 contain the wording "restoring boot configuration information." To some extent this has already been discussed above, as meaning something different from "resuming" the information. To resume certain information, the information obviously must first be brought back from non-volatile storage.

49.     OSS earlier contended the phrase should be read as "using boot configuration information during a boot process from a previous normal boot process." Near the time of the hearing, OSS agreed with my tentative reading, "during a boot process, retrieving boot configuration information stored earlier.

50.     Apple contends it should mean "returning stored boot configuration information to correspondent main memory segments and appropriate storage for device status."

51.     I believe each side's view has some measure of legitimacy. However, I have concluded earlier herein, in accord with Dr. Ligler's declaration and the normal patent law view, that two different claim terms, "restoring" and "resuming," should have different meanings. Restoring must come before resuming. My recommendation therefore adopts Apple's substitution of "returning" instead of "retrieving," but continues to omit Apple's proposed language about the *destination* of the restoration, namely "to correspondent main memory segments and appropriate storage for device status." We need to check the intrinsic evidence to see if such a constraint is warranted. Apple points out (Br. 18) that Fig. 7 of the Kang drawings indicates that the restoration is "into correspondent memory segment." This, however, is a feature only of a preferred embodiment, and that alone will not warrant reading it into a claim. I can find no justification for restricting the meaning of "restoring" by including same-place language urged by Apple. I do not see why a software designer could not restore the BCI to a different place in memory if she so chose, provided subsequent usage steps are designed to know where to find it.

52.     OSS, by agreeing with my earlier tentative construction, apparently does not object to my insertion of "during a boot process" for these particular claims.

53.     I therefore recommend that the Court adopt as its interpretation of "restoring boot configuration information":

> during a boot process, returning stored boot configuration information to main memory

## H. Basic input output system (BIOS)

54.     The phrase basic input output system was discussed earlier (topic A), wherein the parties agreed upon a meaning for "BIOS functions." Now we must deal with BIOS itself. The word – or acronym – appears in asserted claims 1, 6, and 57. Much of the definition is agreed upon by the parties. They concur[1] that the definition of BIOS should include at least the following wording:

---

[1] OSS's responsive Markman brief accepted the first sentence of Apple's proposed construction. OSS Resp. Br. 12.

> A plurality of computer routines for providing control of and low-level interfaces to basic hardware devices and for initializing those devices

However, Apple would add the following clauses, which OSS strenuously opposes: "stored on a ROM chip inside a PC-compatible computer . . . . BIOS is not re-entrant, utilizes registers that are at most 16-bits in length, and executes in a limited address space." Apple attempts to support these additional proposed constraints with expert testimony of Dr. Ligler, submitted with Apple's initial claim construction brief. However, before resorting to such extrinsic evidence, we must first examine the intrinsic evidence to see if it answers the query.

55.    We examine both the intrinsic and extrinsic evidence while bearing in mind that the scope of a claim term is fixed as of the patent's filing date, which in this case the parties agree is the Korean filing date, May 11, 1998. See, e.g., *Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, 381 F.3d 1111, 1116 ("A court construing a patent claim seeks to accord a claim the meaning it would have to a person of ordinary skill in the art at the time of the invention"); *PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1363 (Fed. Cir. 2005) (meaning of claim "must be interpreted as of [the] effective filing date" of the patent application). Thus, while the variety of things that fall within the boundaries of a claim might increase or decrease over time as new configurations are developed, the claim's boundaries themselves cannot change.

56.    The Kang patent includes some clues as to the definition of BIOS, understood as of the patent filing date. In the Background of the Invention section, the patent tells us three things about BIOS (col. 2, lines 2-12):

> (i) The BIOS codes include a plurality of computer routines for controlling devices such as a system clock, video output display 6, disk controller 5, and keyboard and thus provide a low-level interface to these devices.

> (ii) The BIOS is generally stored in a Flash ROM.

> (iii) Shortly after power on or a reset button is pressed, the CPU begins executing the ROM BIOS codes. The BIOS codes for POST are, first, executed to diagnose and initialize devices attached to the computer system and obtain the status of the devices.

57.     From this information we can deduce part of the definition of BIOS, and it is the part on which the parties concur: A plurality of computer routines for providing control of and low-level interfaces to basic hardware devices and for initializing those devices. BIOS must, of course, have codes for the mentioned routines. Whether these codes must be stored in read-only memory (ROM) is not so clear. We now turn to the extrinsic evidence given by Apple's expert, Dr. Ligler, and to possible aid from contemporary technical dictionaries. OSS's expert, Dr. Kogan, did not give evidence on this point.

58.     Dr. Ligler testified (Depo. 145): "the BIOS could be stored on a ROM chip, yes, and early on it was either stored on a ROM chip or other type of non-volatile storage, but sometimes the non-volatility was having a small battery to back up a volatile chip, such as a RAM . . . ." This concession, although perhaps a small one, on the non-necessity of ROM storage, is sufficient in my view to prevent importing the ROM chip limitation that Apple seeks here.

59.     We now examine Apple's proposed constraint that BIOS is limited to a chip inside a PC-compatible computer. In his first declaration submitted in this case, Dr. Ligler stated (¶23):

> In my opinion, the definition of "BIOS" to one of ordinary skill in the art in the context of the '092 patent in the timeframe of the filing of the patent would be either identical or equivalent to "The plurality of computer routines for providing control of and low-level interfaces to basic hardware devices and for initializing those devices."

He then added some commentary concerning EFI (Extended Firmware Interface), pointing out that this interface did not exist as of 1998. He also said that the Kang patent's reference to system clock, video output display, disk controller, and keyboard were references to components of PC-compatible machines as of 1998. (¶¶ 25-27). OSS submitted no expert evidence supporting a broader definition of BIOS as of 1998.

60.     In addition to the Ligler evidence, there are dictionary references defining BIOS as specifically an IBM-PC, or PC-compatible, component. See, e.g., Barron's *Dictionary of Computer and Internet Terms,* 6th Ed., 1998, defining BIOS as, inter alia: "a set of procedures stored on  ROM chip inside PC-compatible computers." See also the

1996 *Dictionary of PC Hardware and Data Communications Terms* (DI 78-32, Exhibit D-21 to the Joint Construction Statement), which discusses BIOS as being PC-related.

61.     While the intrinsic evidence is mostly silent on the scope of the term BIOS, the extrinsic evidence points clearly in support of the view that it was understood to be a PC-related term. Apple's proposed inclusion of that constraint is therefore valid.

62.     We next consider Apple's proposed inclusion of the constraint that BIOS routines, specifically device drivers, are not "reentrant." Reentrance is, in its simplest terms, the property of a routine to be interrupted before execution of it is finished, and which can be resumed, or re-entered, later without loss of accuracy. Dr. Ligler has testified that "BIOS's generally were not reentering in 1998." Depo. 146. OSS points out the use of the word "generally" as signaling not always, and thus non-reentrance should not be imported into the definition. However, the Barron's 1998 dictionary referenced above is more specific, stating "the BIOS is not reentrant." OSS has submitted no evidence to the contrary concerning non-reentrance of BIOS. I therefore think Apple's proposal to restrict the meaning of BIOS in this manner is valid.

63.     However, I think it inadvisable to include Apple's proposed constraints that BIOS must use registers that are no greater than 16 bits in length and that it executes in a limited address space. It is true that these features are mentioned in a technical dictionary and in Dr. Ligler's original declaration, but seem more to be comments on the limitations of early PC machines than on the definition of BIOS generally. To expand on Apple's baseball analogy used at the hearing, if a contemporary sports dictionary defined "baseball stadium" as including the playing fields and seats for spectators, and added a sentence saying that baseball stadiums have between 200 and 40,000 spectator seats, I do not believe anyone would argue that a later-built facility having a baseball playing field and 50,000 spectator seats was not "a baseball stadium." Such sentences are commentary only, not lexicographic.

64.     I therefore recommend that the construction of BIOS should be:

The plurality of computer routines for providing control of and low-level interfaces to basic hardware devices in a PC-compatible computer and for initializing those devices. BIOS is not reentrant.

I. <u>Created while executing a previous normal booting process</u>

65.     Asserted claims 1 and 19 contain the phrase "created while executing a previous normal booting process." These words modify "boot configuration information," or BCI, which has already been discussed herein.

66.     The parties' proposals here are quite similar. OSS proposes that the phrase should be interpreted as "created while executing a previous booting process during which no errors occurred." Apple contends it should mean "generated while executing a previous normal booting process and recorded to non-volatile memory prior to a subsequent boot." Both proposals contain, in my view, unnecessary additional phraseology. OSS's use of "in which no errors occurred" does not appear literally anywhere in the patent, whereas "normal" appears some 20 times. Apple's language about recording the information to a non-volatile medium (such as hard disk) has been discussed before and is no longer in contention between the parties as far as the final destination is concerned. I therefore see no benefit to the parties' add-on phrases. I recommend that the phrase be interpreted as:

Generated while executing a previous normal booting process.

J. <u>Stored while executing a previous normal booting process</u>

67.     The next phrase to be construed appears in asserted claim 6: "Stored while executing a previous normal booting process."

68.     OSS contends the phrase should mean "Recorded while executing a previous normal boot." Apple contends it should be read as "Recorded to non-volatile memory while executing a previous normal boot process." I believe there is no longer any dispute between the parties regarding the ultimate destination of the information being stored: it is to non-volatile storage such as a disk. The only issue here is the time the initial recording of the information might occur.

69.     I agree with OSS that there is no reason to constrain the *initial* storage to a non-volatile medium such as a disk. However, it ends up there at a later time for storage.

I therefore recommend that the phrase be construed that does not limit the initial recording medium but does constrain it for storage:

> Recorded while executing a previous normal boot process, and stored in a non-volatile medium for later use

## J(1): Addresses of which have been stored while executing a previous normal booting process

70.     The parties have agreed that this phrase, appearing in asserted claim 8, should track the meaning ascribed to "stored while executing a previous normal booting process" in topic J here, and  that the additional words here, "addresses if which have been" do not need further interpretation but should be given their ordinary meaning. Accordingly, I recommend for this term the construction:

> Addresses of which have been recorded while executing a previous normal boot process, and stored in a non-volatile medium for later use

## K. Stored while executing a previous boot process

71.     The limitation in claims 28 and 57, "stored while executing a previous boot process," is similar to the phrase interpreted immediately above, except that the previous boot need not be "normal" here. The phrase should therefore have the same meaning, except for that word:

> stored during a previous boot process, in a non-volatile medium for later use.

## L. Storing the boot configuration information from execution of the POST operation

72.     This term appears in asserted claim 1. I have already recommended that while the *initial* generation or recording of boot configuration information (BCI), which

results from the power-on self-test (POST) might be in RAM, the final storage place must be in a non-volatile medium such as hard disk.

73.    For this particular phrase, OSS recommends the construction: "Recording in memory the boot configuration information generated by a POST operation." Certainly that is what initially happens. Apple recommends: "Recording to non-volatile memory the boot configuration information from execution of the POST operation." Clearly that is what eventually happens. I therefore think a blending of the two recommendations is the best choice:

> Recording the boot configuration information generated by a POST operation. Initially, recording may be in memory, but ultimately it must be in non-volatile storage for subsequent use.

M. Storing a current boot configuration information [BCI] after execution of the POST operation

74.    This phrase, appearing in asserted claim 19, is very similar to the one just construed in topic L, except for the word "current" before BCI. This would be implicit in any event; no one would want to store a non-current BCI. The storing can be at any time after the power-on self-test, and it need not be in non-volatile medium at that time. It must later be stored in such a medium. I therefore recommend  the construction:

> Recording a current boot configuration information after execution of a POST operation. Initially, the recording may be in memory, but ultimately it must be in non-volatile storage for subsequent use.

**ANALYSIS OF SUPPLEMENTAL ASSERTED CLAIMS**

75.    As mentioned earlier, the Court has permitted OSS to assert the following additional claims of the patent in suit: 2-4, 7-9, 13-18, 29-56, and 58. These claims will be referred to as "supplemental claims." They contain fifteen phrases that have not yet been discussed and that are in contention, and several others whose meanings have been stipulated, either initially or as the hearing date approached.

22

## N. The Initially Stipulated Terms

76.     The parties prior to the hearing stipulated constructions of terms of the supplemental claims, as follows:

| Item | Claim(s) | Term | Agreed Construction |
|---|---|---|---|
| N(1) | 3, 9, 29, 35, 40, 44, 51, 58 | "extended memory" | The portion of memory that is not used prior to storing or restoring the boot configuration information |
| N(2) | 3, 9 | "an extended memory becomes in use" | "Extended memory" is construed separately, above. Remainder of the claim term should be given its plain and ordinary meaning. |
| N(3) | 8 | addresses of which have been stored while executing a previous normal booting process | Stipulated: Parties have already briefed stored while executing a previous normal booting process. Remainder of claim should be given its plain and ordinary meaning |
| N(4) | 45 | first boot up process | Stipulated: Each wherein clause must occur during the "first boot up process." |
| N(5) | 52 | selected areas of computer memory | Stipulated: This construction should track that of "selected portions of main memory," with "portions" changed to "areas" |

The non-agreed and the later stipulated terms will now be addressed.

## O. Memory state of the computer system

77.     This term appears in the preamble of claim 13, and not in the body of the claim. It is therefore questionable whether the phrase needs to be construed at all. Normally, the preamble is not an actual limitation of the claim's scope, but only a sort of

guide to understanding the body of the claim, where the real legal substance lies. See, e.g., *Rowe v. Dror*, 112 F.3d 473, 478 (Fed. Cir. 1997) ("where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention, the preamble is not a claim limitation"). A preamble is customarily much broader than what is defined in the claim's body, else there would be no need for a body of the claim at all. Case law on this subject will be discussed in detail later herein, in the instances of certain preambles (not this one) that are actually in dispute as to whether or not they are true claim limitations. Since the parties appear to have some degree of dispute about the phrase in the preamble of claim 13, I will recommend a construction, as a matter of precaution.

78.     OSS proposes that "memory state" means simply the contents of memory. OSS argues that the contents can be glimpsed at any point in time, not necessarily during a boot process. Apple urges that it should have the further restriction that the state must be at a point in time during the boot process. I agree that memory contents are not static but are changing frequently as a computer operates, but I believe that to be undisputed. The issue here is whether a particular time frame for glimpsing the memory content should be read into the preamble.

79.     The complete preamble for claim 13 reads: "A method for supporting fast booting a computer system through storing/resuming a memory state of the computer system, comprising the steps of". The use of the singular "a" before the phrase in question indicates that only one set of memory contents is to be stored or later resumed. I see no reason to import into this preamble, as urged by Apple, a specific window of time during which the glimpsing must be done. The body of the claim, and other claim-construction factors, may turn out to indicate that the snapshot must be taken during a booting process. That could certainly make sense. However, such a constraint does not appear in the preamble.

80.     Accordingly, I recommend that the phrase be construed as

the contents of the computer memory at a point in time

P. <u>Memory contents state</u>

24

81.     Closely related to the foregoing construction is a very similar phrase appearing in the body of claim 13: "memory contents state." The dispute between the parties on this phrase is similar to their disagreement about the preamble. Apple argues that the phrase must be restricted to a memory contents state as seen during the boot process, while OSS proposes no such constraint.

82.     Once again there appears to be no dispute that a particular point in time is implied by "state" of the memory, as it is subject to frequent changes. However, the complete step of the claim is "checking whether to store a memory contents state." If we put aside for a moment the preferred embodiments described in the Kang patent, this checking, according to the claim language alone, could presumably occur at any time. The remainder of the claim makes clear that *if* the checking comes out a certain way, storage of a new BCI will occur. Looking to the preferred embodiments, Figs. 4 and 5 of the patent both show checking memory contents during a boot process, i.e., before GUI is loaded. In Fig. 4, the normal boot, this checking-whether-to-store occurs at decision point S38. In Fig. 5, the quick boot, the checking occurs at both S52-1 (to see if there is already a saved configuration) and S54 (to see if it is usable, based on whether certain changes have occurred in the system). Nonetheless, OSS argues that Figs. 4 and 5 illustrate that the timing is not essential, and that only the memory content is. OSS submits no evidence supporting this view of what is essential about Figs. 4 and 5 and what is not. The Summary of the Invention portion of the patent's written description tells us that in this invention the BCI was "created and saved in a disk in the preceding boot process." Col. 3, lines 2-3. The patentee having thus acted as his own lexicographer, I agree with Apple that the checking must be during a boot process.

83.     I therefore recommend that the term in question be construed as

the contents of memory at a point in time during the boot process

Q. Checking memory contents of a plurality of units of the main memory

84.     The parties have accepted the special master's proposed construction for this phrase:

checking the contents of each of a plurality of addresses in the main memory

### R. Area necessary for system operation

85.     On this limitation the parties are in substantial agreement, save for an explicit exclusion desired by Apple and opposed by OSS. OSS's proposal for construing this phrase is: Area in memory to which certain functionality is directed and, if contents are missing, cause the system to be incapable of operation. The initial part of Apple's proposal is similar: a portion, but not the entirety, of main memory that must be present for the system to operate at all.

86.     However, Apple wishes to add an explicit exclusion to the definition, viz., "which does not include extended memory." Defining a term partially by what it does not include is sometimes seen in patent claim interpretation. See, e.g., *Ecolab, Inc. v. Paraclipse, Inc.,* 285 F.3d 1362, 1371 (Fed. Cir. 2002) (affirming district court's construction of "internal reflecting surface" as not including "black matte surface"); *Helmsderfer v. Bobrick Washroom Equipment, Inc.,* 527 F.3d 1379, 1381 (affirming district court's construction of "partially hidden" as excluding "totally hidden"). The exclusion is appropriate here. The parties have agreed that "extended memory" should be construed as "the portion of memory that is not used prior to storing or restoring the boot configuration information." Obviously, if extended memory is not used prior to those operations, it would seem clear that extended memory cannot be needed for the system to operate at all.

87.     In addition, Dr. Ligler's declaration points out that the '092 specification does not teach that an area necessary for system operation must include extended memory. Ligler suppl. decl. para. 13. It is also true that the patent in suit discusses, for the preferred embodiment, the advantages of saving BCI prior to the use of extended memory. See '092 patent, col. 6, lines 16-17; Ligler suppl decl. para. 13. I find no evidence, either intrinsic or extrinsic, suggesting that extended memory is essential to system operation.

88.     Accordingly, I recommend that the phrase in question be construed as

a portion, but not the entirety, of memory that must be present for the system to operate at all. This does not include extended memory, because that is not needed for the system to operate.


## S. Preambles

89.     The next dispute is over whether the preambles of claims 31 and 52 should be read as true limitations for these claims, or as merely introductory words that do not affect actual scope of the claims. Apple says the preambles limit these respective claims; OSS says they do not.

90.     The subject of when preambles count as claim limitations, versus mere introductory clauses that do not limit the claims, has been a thorny one over the years for many courts. Early case law guidance was only that the preamble is a limitation when it "breathes life, meaning, and vitality to the claim." See, e.g., *Kropa v. Robie*, 187 F.2d 150, 152 (CCPA 1951). This formulation proved somewhat inadequate due to its vagueness, according to Federal Circuit opinions. The most instructive of the Federal Circuit decision on the subject is *Catalina Mktg. Int'l. Inc. v. Coolsavings.com, Inc.,* 289 F.3d 801 (Fed. Cir. 2002). Cited by both sides here, the case states an overall succinct observation that "No litmus test defines when a preamble limits claim scope." Id. at 807. The court in *Catalina* went on to lay out, in addition to the traditional "breathing" test, several more pointed inquiries for deciding whether to treat the preamble words as limitations. Id. at 808. I state them here in a different order for convenience:

1.  Was there "clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art"?

2.  Is the "preamble is essential to understand limitations or terms in the claim body"?

3.  Does the preamble recite "additional structure or steps underscored as important by the specification"?

4.  Is there a "dependence on a particular disputed preamble phrase for antecedent basis" in the body of the claim?

Questions 1 and 2 can be answered in the negative here for both claim 31 and claim 52. The prosecution history does not indicate any particular reliance on preamble language to procure allowance of the claims, and the body of each claim is readily understandable without recourse to its preamble.

91.     The third question above, whether the preambles recite "additional structure or steps underscored as important by the specification" is more significant. In both claims, the preambles state that the BCI is created and saved "*during a preceding boot process.*" The body of each claim refers to what happens in a "subsequent restart operation," so it is clear that a boot process must have occurred at some earlier time. However, the body of each claim is silent about whether the BCI must be saved "during" that earlier boot process, versus some possibly later time. This is perhaps a feature that could be read into the claims from their preambles. All the other recitations in the preambles – personal computer system, attached devices, computer memory, and storage medium – also appear in the bodies of these claims, and hence are limitations of the claims without regard to the language of the preambles.

92.     Following *Catalina,* we must ask whether the "during" feature mentioned in the preamble of each claim under consideration is one that the specification underscores as important. The answer is yes. First, the Summary of the Invention section states that in the present invention the BCI "on memory and the attached devices were created and saved in a disk in the preceding boot process, not at some later time. This is even referred to as a "primary object" of the invention. Col. 2, line 65, to col. 3, line 5, in the Summary of the Invention section of the patent, recites, with emphasis added:

> It is therefore a primary object of the present invention to provide a method and apparatus that significantly reduces the time required for boot process after a POST operation *by using a boot configuration information* on memory and the attached devices that were *created and saved in a disk in the preceding boot process*, and thereby skipping execution of statements in an initial device configuration file and an automatic batch file.

93.     The Summary of the Invention section goes on to describe the BCI as being saved to the disk and the graphic user interface (GUI) then being run. Col. 3, lines 10-14. The parties are in accord that at the time of running the GUI the boot process is still ongoing; so the saving is during the boot process. Finally, in the written description of the preferred embodiment, the inventor explains why it is important to save the BCI prior to

loading the operating system, i.e., while still in the booting process. Col. 5, lines 1-4. Thus, with the "during" term is stated multiple times in the patent to be of major importance. Therefore, the answer to *Catalina's* third inquiry must be yes.

94.    The fourth *Catalina* factor – whether the preamble language provides antecedent support for terms in the body of the claim – should also be examined in deciding whether the preamble is a true limitation of the claim or merely an introductory set of words to provide added clarity. A preamble term that provides antecedent support to a term in the claim's body may signal that the preamble recitation is a true claim limitation.[2] Here the saving step (d) of each claim does not specify that the saving is done during a boot process; but the preamble of each claim does so specify. This lends further support to the third *Catalina* factor, indicating that the "during" expression is a true claim limitation.

95.    OSS contends that the preambles here are merely statements of intended use, and hence should not be viewed as claim limitations. OSS cites *Rowe v. Dror*, supra, which indeed stands for that proposition of law. However, I cannot agree that the preambles here in question are mere statements of purpose or intended use. On the contrary, they contain most of the steps of the methods defined in the bodies of these claims. They cannot be regarded as merely introductory or peripheral in any sense.

96.    Weighing all four of the *Catalina* factors here, I agree with Apple that the preambles of claims 31 and 52 are true limitations with respect to the timing of saving the BCI – it must happen during the preceding boot process. Whether the preambles are limiting in any other regard is a moot question, since the terms – personal computer system, attached devices, computer memory, and storage medium – also appear in the bodies of the claims and are limitations for that reason.

---

[2] Apple contends the recent Federal Circuit case of *C.W. Zumbiel Co. v. Kappos*, 702 F.3d 1371 (Fed. Cir. 2012) stands for the proposition that whenever a preamble provides antecedent basis for a term appearing in the body of the claim, the preamble is always a true limitation. The court in *Zumbiel,* held, 702 F.3d at 1385, that it was proper for the PTO board of appeals to read the word "containers" as a claim limitation when it appeared in the preamble in that case and also appeared within one of the elements of the body of the claim. However, the court in the sentence relied upon by Apple here was recapitulating its prior holding in *Catalina.* With respect to preambles that provide antecedent basis, the court in *Catalina* had put it this way: " . . . dependence on a particular disputed preamble phrase for antecedent basis *may* limit claim scope because it indicates a reliance on both the preamble and claim body to define the claimed invention." *Catalina,* 289 F.3d at 808, emphasis added.

## T. Prior to initiating normal user operation

97.     Here the parties at one point disagreed about when normal user operation begins. OSS contended this phrase should mean "before a user is allowed to access the system through the operating system's GUI [graphical user interface]." Apple contended it should mean "prior to completion of the boot process."

98.     We very nearly reached agreement on this subject at the hearing. OSS stated in its Supplemental Responsive Brief (Br. 9):  "It appears that the parties agree that normal user operation begins when a user is presented with a log-in screen, *i.e.*, when the GUI loads." At the hearing, this was acknowledged by Apple as an appropriate way of characterizing the situation. PM Tr. 76. However, some systems do not utilize a log-in screen. To account for that possibility, I recommend that the Court construe this phrase as

> prior to the loading and presentation of the graphical user interface, such as a user log-in screen, to the user

## U. Information reflecting a status of the attached devices, the computer memory, and/or the additional programs

99.     The parties now agree on, and I therefore adopt, the following construction for this phrase:

> saving to the storage medium information reflecting at least a status of attached devices and a portion of computer memory

## V. Bootstrap loader program

100.   This phrase appearing in claims 33 and 55 is no longer contested. Both parties accept the special master's proposal:

> a software program whose execution brings a larger program, such as an operating system or its loader, into memory

W. <u>Sequence of Steps</u>

101.    The next interpretive issue is whether steps (b) through (d) of claims 33 and 55 must be performed in order, i.e., first step (b), then (c), and then (d); or whether the claim is met whenever the steps are done, regardless of the sequence in which they are performed. OSS says the sequence is immaterial, but Apple says it is essential.

102.    The steps in question are, for claim 33:

> b) executing a bootstrap loader program which prepares the computer system for execution of a graphical operating system;

> c) writing selected portions of memory contents from a main memory to a storage medium location;

> d) executing the graphical operating system;

In claim 55 the involved steps are the same for (b) and (d), but slightly different for step (c):

> b) executing a bootstrap loader program which prepares the computer system for execution of a graphical operating system;

> c) writing selected portions of main memory contents and status of attached devices from a main memory to a storage medium location;

> d) executing the graphical operating system;

For convenience we can treat both claims the same way here.

103.    There is a case-law presumption of sorts that a method claim's steps need not be carried out in order. See *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1342 (Fed. Cir. 2001) ("Unless the steps of a method actually recite an order,

the steps are not ordinarily construed to require one.") Here the claim language does not explicitly specify performing one step before the other, such as saying "upon completion of step X, then carrying out step Y."

104.   Here step (c) will be recognized as the storing of the BCI, as discussed earlier. It seems to me that this step (c) could be done before executing a bootstrap loader program[3] (step (b)), as well as after, as recited in the claim. The real issue is whether step (c), saving the BCI, can be done after step (d), executing the graphical operating system, or GUI.

105.   As discussed earlier in topic T, loading of the GUI brings on the log-in screen, and the boot process is over. The user will then start using the system, very likely altering the memory contents. OSS argues that even so, it could be possible to have stored the BCI information in a fairly safe place in RAM until after the GUI is loaded, and then save it from RAM to disk. OSS counsel stressed at the hearing that the mere loading of GUI, even if that completes the boot process, would not interfere with the BCI as it sits in memory; it could still be saved to disk. Counsel admits, however, that there is some degree of peril in waiting that long, because some user operations could change the contents of the memory addresses where the BCI is residing.

106.   OSS says it is entitled to this broader reading for claim 33, and I believe OSS is correct. OSS looks to claim 35, which depends from claim 33 in issue here and hence is narrower than claim 33. Claim 35 recites the constraint that the saving of the BCI is done "prior to the use of extended memory." We know that at least in the preferred embodiments of the patent, extended memory does not come into play until the operating system is loaded. See col. 6, lines 12-19. This tends to verify that claim 33, presumably broader pursuant to the doctrine of claim differentiation,[4] has no such time-sequence limitation for steps (c) and (d). It is true that the Kang patent's Summary of the Invention sets out the loading of the graphical user interface last, after the saving operation. Col. 3, lines 6-14. It is the same in the embodiment of Figs. 3-5-7 and the embodiment of Figs. 4-6.   While there may obviously be advantages to saving sooner, the

---

[3] A definition for this term has, as stated above, been agreed between the parties: "a software program whose execution brings a larger program, such as an operating system or its loader, into memory."

[4] Claim differentiation is an aid to interpreting a broader claim by observing the language of a narrower claim. Two claims of identical scope are not supposed to be allowed by a PTO examiner. Hence, if a dependent claim adds a limitation of some sort, it is presumed that the broader claim is not limited in that way. See, e.g., *Phillips,* 415 F.3d at 1315.

patent does not say anywhere that the saving of BCI *must* be done prior to loading of the GUI, and I find no reason to impose that constraint on independent claim 33. Saving the BCI later may not be the ideal way to go about a quick-boot process, but it is not an "illogical sequence" as contended by Apple. I have seen no expert evidence supporting the Apple view.

107.    Both parties are in agreement that step (b) must precede the other two steps. PM Tr. 83-84.

108.    I therefore recommend that the court adopt the construction that:

Step (b) must precede steps (c) and (d), but step (c) can be carried out before or after step (d).

## X. Checking main memory contents of the main memory on a block-by-block basis

109.    The parties now agree on the construction for this phrase:

checking each block of main memory on a block-by-block basis

## Y. Checking main memory contents of the main memory on a segment-by-segment basis

110.    The parties now concur on the following construction for this phrase:

checking each segment of main memory on a segment-by-segment basis

## Z. Checking if a designated boot configuration information is different from the resuming boot configuration information

111.    Apple contends this phrase is indefinite, due to the presence of the word "designated," and therefore cannot be construed. OSS reads it essentially as though it were not in the claim at all, "determining whether boot configuration information is different from boot configuration from a prior boot." The word "designated" appears nowhere in the written description, but was in originally filed claim 7, which was allowed and issued as claim 7, and it was again allowed in that claim in the reissue proceeding. Nothing is said about it in the file history.

112.    Definiteness of a claim term need not be perfect. The case law tells us a claim should not be found indefinite unless it is "insolubly ambiguous" or "not amenable to construction." See, e.g., *Star Sci., Inc. v. R.J. Reynolds Tobacco Co.,* 655 F.3d 1364, 1373 (Fed. Cir. 2011), *cert. dismissed,* 133 S.Ct. 97 (2012); *Datamize, LLC v. Plumtree Software Inc.,* 417 F.3d 1342, 1347 (Fed. Cir. 2005). Moreover, the statutory presumption of validity – and hence of definiteness – is particularly appropriate here, because the PTO examiner was looking at this very language when he allowed the claims.

113.    Comparison of a BCI to an earlier BCI is discussed in the patent specification in connection with the preferred embodiment: "First, it is checked whether or not a current boot configuration has been changed based on the restored boot configuration information. If there is any change in the boot configuration," then certain actions are taken, but otherwise not. Col. 5, lines 40-42. This discussion seems straightforward enough. In this embodiment the designated BCI is the current information collected during the later boot process. More generally, "a designated" is simply another way of saying "any given" or "a chosen." These words are broad, but they are not indefinite. Given that the remainder of the phrase compares this information to that obtained in a "prior boot," it is clear that the "designated" BCI must mean a subsequent one.

114.    I do not think the claim here fits the case law characterizations for invalidity stated above. While the wording may be imprecise, the written description contains some clues, and the file history reveals PTO examiners who did not hesitate to make indefiniteness rejections where they thought they were needed. During the original prosecution, in his first office action (FH 95) the examiner rejected all the initial claims, including claim 7, for indefiniteness, but not based on the term "designated." After some amendments (FH 108-110), not involving "designated," the claims were allowed and issued. In the reissue prosecution, some claims, not including claim 7, were rejected by a different PTO examiner for indefiniteness. (RFH 48)  The rejections were eventually

overcome and the reissue granted. The PTO record therefore suggests the examiners were attuned to possible indefiniteness of claim terms, but they did not find this one indefinite.

115.    The statutory presumption of validity, on the point of definiteness, has not been overcome here by Apple, who has cited no intrinsic evidence and provided no extrinsic evidence on the point.

116.    I therefore am of the view that "designated" is reasonably definite, and that the phrase in question should be construed basically as OSS suggests, but adding "subsequent," as follows:

determining whether subsequent boot configuration information is different from boot configuration information from a prior boot

117.    For the Court's convenience, a table listing all the recommended constructions is attached hereto as an Appendix.

Date: April 12, 2013

Paul M. Janicke,
Special Master

35

## APPENDIX --
## RECOMMENDED CONSTRUCTIONS
## OF CLAIM TERMS

| Item | Claims involved | Term Construed | Recommended Construction |
|------|-----------------|----------------|--------------------------|
| | | | |
| A | 19, 28 | BIOS functions | Stipulated: Functions performed by a BIOS |
| B | 1, 6, 19, 28, 57 | Boot[ing] process | The process beginning when a computer system is powered on or a reset button is pressed, and terminating when the system is brought into a known useful state in which application programs can be executed. This state is indicated by the loading and presentation to the user of the graphical user interface, such as a user log-in screen. |
| C | 1, 6, 19, 28, 57 | Boot configuration information (BCI) | information reflecting, at a point in time during a boot, contents of main memory and the status of attached devices. |
| D | 1, 6 | Selected portions of main memory contents | Portions, but not the entirety, of main memory contents, selected based upon a check of contents of each portion of main memory. |
| D(1) | 52 | Selected areas of computer memory | Areas, but not the entirety, of main memory contents, selected based upon a check of contents of each area of main memory (agreed this should track item (D)) |
| E | 19, 28, 57 | Selectively stored portions of main memory contents | Portions, but not the entirety, of main memory contents, selected and stored based upon a check of contents of each portion of main memory. |
| F | 6 | Resuming a boot configuration by using the boot configuration information | in a later boot process, using previously stored boot configuration information at the same processing point from which it was previously taken |

| G | 28, 57 | Restoring boot configuration information | during a boot process, returning stored boot configuration information to main memory |
| H | 1, 6, 57 | Basic input output system (BIOS) | The plurality of computer routines for providing control of and low-level interfaces to basic hardware devices in a PC-compatible computer and for initializing those devices. BIOS is not reentrant. |
| I | 1, 19 | Created while executing a previous normal booting process | Generated while executing a previous normal booting process. |
| J | 6 | Stored while executing a previous normal booting process | Recorded while executing a previous normal boot process, and stored in a non-volatile medium for later use |
| J(1) | 8 | Addresses of which have been stored while executing a previous normal booting process | Addresses of which have been recorded while executing a previous normal boot process, and stored in a non-volatile medium for later use (agreed this should track item (J)) |
| K | 28, 57 | Stored while executing a previous boot process | stored during a previous boot process, in a non-volatile medium for later use. |
| L | 1 | Storing the boot configuration information from execution of the POST operation | Recording the boot configuration information generated by a POST operation. Initially, recording may be in memory, but ultimately it must be in non-volatile storage for subsequent use. |
| M | 19 | Storing a current boot configuration information [BCI] after execution of the POST operation | Recording a current boot configuration information after execution of a POST operation. Initially, the recording may be in memory, but ultimately it must be in non-volatile storage for subsequent use. |
| N(1) | 3, 9, 29, 35, 40, 44, 51, 58 | extended memory | Stipulated: The portion of memory that is not used prior to storing or restoring the boot configuration information |
| N(2) | 39 | an extended memory becomes in use | Stipulated: Extended memory is construed separately, above.  Remainder of the claim term should be given its plain and |

| | | | ordinary meaning. |
|---|---|---|---|
| N(3) | 8 | addresses of which have been stored while executing a previous normal booting process | Stipulated: Parties have already briefed stored while executing a previous normal booting process. Remainder of claim should be given its plain and ordinary meaning |
| N(4) | 45 | first boot up process | Stipulated: Each wherein clause must occur during the first boot up process. |
| N(5) | 52 | selected areas of computer memory | Stipulated: This construction should track that of "selected portions of main memory" [Item (d) above] with "portions" changed to "areas" |
| O | 13 | memory state of the computer system [preamble of claim] | the contents of the computer memory at a point in time |
| P | 13 | memory contents state [body of claim] | the contents of memory at a point in time during the boot process |
| Q | 13 | checking memory contents of a plurality of units of the main memory | Agreed: checking the contents of each of a plurality of addresses in the main memory |
| R | 13 | area necessary for system operation | a portion, but not the entirety, of memory that must be present for the system to operate at all. This does not include extended memory, because that is not needed for the system to operate |
| S | 31, 52 | [Preambles] | Preambles of claims 31 and 52 are limitations with respect to the time of saving the BCI; it must be during a preceding boot process |
| T | 31, 52 | prior to initiating normal user operation | Prior to the loading and presentation of the graphical user interface, such as a user log-in screen, to the user |
| U | 31 | saving to the storage medium information reflecting a status of the attached devices, the computer memory, and/or the additional programs | Agreed: saving to the storage medium information reflecting at least a status of attached devices and a portion of computer memory |
| V | 33, 55 | bootstrap loader program | Agreed: a software program whose execution brings a larger program, |

| | | | |
|---|---|---|---|
| | | | such as an operating system or its loader, into memory |
| W | 33, 55 | [Sequence of steps (b) - (d)] | Step (b) must precede steps (c) and (d), but step (c) can be carried out before or after step (d). |
| X | 37 | checking main memory contents of the main memory on a block-by-block basis | Agreed: checking each block of main memory on a block-by-block basis |
| Y | 41 | checking main memory contents of the main memory on a segment-by-segment basis | Agreed: checking each segment of main memory on a segment-by-segment basis |
| Z | 7 | checking if a designated boot configuration information is different from the resuming boot configuration information | determining whether subsequent boot configuration information is different from boot configuration information from a prior boot |